# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

RONNA HUISMAN,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C09-4053-PAZ

**MEMORANDUM OPINION AND
ORDER**

---

This matter is before the court for judicial review of the defendant's decision denying the plaintiff's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* On June 28, 2006, the plaintiff Ronna Huisman filed an application alleging she has been disabled since November 30, 2005.[1] Her application was denied initially and on reconsideration. She had a hearing before an Administrative Law Judge ("ALJ") on January 15, 2009. On March 2, 2009, the ALJ issued her decision, finding that Huisman was not disabled because she could return to her past relevant work. On May 7, 2009, the Appeals Council denied Huisman's request for review, making the ALJ's decision the final decision of the Commissioner.

Huisman filed a timely Complaint in this court seeking judicial review of the ALJ's ruling. She argues the ALJ erred in relying on an outdated residual functional capacity assessment and in asking the vocational expert an inaccurate hypothetical question. She asks that she be awarded benefits beginning February 6, 2006. Alternatively, she asks that

---

[1]Her date last insured was December 31, 2006.

her case be remanded to allow the Commissioner to correct the errors that occurred in her case.[2] Doc. No. 8, p. 16.

On August 21, 2009, with the parties' consent, Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. The parties have briefed the issues, and the matter is now fully submitted and ready for review.

The court must decide whether the ALJ applied the correct legal standards, and whether his factual findings are supported by substantial evidence based on a review of the record as a whole. 42 U.S.C. § 405(g); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citations omitted). In this deferential review, the court will consider the record in its entirety to determine whether a reasonable mind would find the evidence adequate to support the Commissioner's conclusion. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citations omitted); *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006).

At the ALJ hearing, Huisman testified she was 51 years old, about 4'11" inches tall, and overweight. She has a GED. She can read, but she does not have good comprehension. She can write and do simple math. She has no college or special training. She has a driver's license, although she seldom drives. She lives with her boyfriend.

She testified that she cannot work because of pain and depression caused by fibromyalgia. She has pain everywhere, from "top to bottom," that feels like en electrical current going through her body. "It's like having the worst flu you can think of[,] where your hair hurts . . ., sound hurts[,] it hurts to blink your eyes[, and] it hurts to walk across the room. . . . [I]f cold touches you, it's like waves[,] and the vomiting, the diarrhea . .

---

[2]Huisman filed an earlier application for disability alleging a disability onset date of September 21, 2001, but that claim was denied. The final administrative decision affirming the denial of the claim was issued on February 6, 2006, so *res judicata* precludes a finding of disability prior to that date. In ruling on the present application, the ALJ expressly refused to reopen or reconsider the decision denying the earlier application. Huisman requests that she be allowed to ask for reconsideration of this ruling if the case is remanded. Doc. No. 10, at 2.

.[,] it's all the time[,] and it never goes away." In the morning, she gets out of bed because the pain wakes her up, not because she is finished sleeping.

She tries to deal with the pain by taking medication, but her prescriptions cause diarrhea and vomiting. She takes oxycodone, tramadol, cyclobenzaprine (Flexeril), vitamin B complex, an acid reducer, allergy medication, and hydrocodone. Walking sometimes helps, but it sometimes makes things worse. She takes hot showers to relax her muscles.

Huisman testified her doctor believes she may have Irritable Bowel Syndrome, which he is attempting to treat. She also suffers from Restless Leg Syndrome. In the evenings, her legs jerk around, and her back gets tense. She cannot get comfortable at night, and if she falls asleep, her legs will jerk around and hurt which causes her to wake up. She suffers from depression, which is being treated with an antidepressant. She has migraines. Her last migraine was about a month before the hearing, and lasted nine days. When she has a migraine, she sees halos and flashing lights and loses vision in her right eye. The migraines cause vomiting and sometimes diarrhea. When she is having a migraine, she cannot blink her eyes or move at all.

As a result of her fibromyalgia, Huisman can sit in one position for only about fifteen to twenty minutes. After that, her muscles contract and she gets a headache, and she has to walk around. She cannot lift and carry more than ten pounds. She can walk between a half mile and a mile. She can stand without walking for between fifteen and twenty minutes. She has trouble remembering things, including the locations of light switches and the way doors open and close in her house. She testified she got stuck in her bedroom one night because she could not remember how to open the door. She has trouble concentrating and staying on track. She likes to sew, but cannot sew anymore because she cannot use her hands or sit still long enough.

On an average day, Huisman gets up early, at three or four o'clock in the morning, because she is unable to stay asleep. When she gets up, she takes her medication and makes a pot of coffee. While she is waiting for her medication to work, she uses the computer. After her second dose of medication, she straightens up the kitchen and may do some dishes. She skips lunch. In the afternoon, she will try to make the bed, and may do a load of laundry. If it is not a day when she is sensitive to sound, she may run the vacuum cleaner. She is able to function only for about an hour after her first dose of medication in the late morning, and for another hour after her second dose of medication in the afternoon. She goes to sleep as early as eight o'clock in the evening, but sometimes she cannot get to sleep until three or four o'clock in the morning, depending on how her day has gone. At the time of the hearing, she rated her pain at four to five on a ten-point scale. She does not use illegal drugs or alcohol.

Huisman last worked in September 2001, as a convenience store clerk. She testified she could not return to that job because she would not be able to stand still or focus long enough to run the register, and she would have trouble operating the register because of carpal tunnel syndrome. Also, she would be unable to do the required chores, such as unloading trucks or mopping floors. She also would not be able to be at her job at specific times, as would be required.

In 2004 and early 2005, Huisman was seen several times by Dr. Dustin Smith at Trimark Physician's Group in Eagle Grove, Iowa. On September 9, 2004, she was given a prescription for Ambien, a sleep aid. On October 7, 2004, she was given a prescription for tramadol for pain, and the prescription was refilled on December 8, 2004. On February 7, 2005, she was prescribed Clarion and quinine. Although the medical records

do not specify why these medications were prescribed, it is obvious that at least some of the medications were prescribed to treat the symptoms of fibromyalgia.[3]

On March 21, 2005, Huisman was seen by Dr. Craig Morito at the Rheumatology Clinic at the University of Iowa. Huisman told Dr. Morito that her symptoms began in 2001, when she started having diffuse aches and pains over her whole body, specifically her back, neck, hips, and left knee. She described her pain as "not in the joints," and as being worse in the morning and evening. Her symptoms usually occurred in two-week cycles. She suffers from stiffness in the morning, but that usually goes away after thirty minutes. She reported that she had been diagnosed with fibromyalgia. She was taking tramadol for pain, and for about one week each month during times of significant distress, she also was taking oxycodone.

Huisman also reported a history of depression. She had seen a psychiatrist and was placed on antidepressants, including Zoloft, which "helped her a lot." However, she stopped taking the medication when she felt better, and the symptoms returned. She then was placed on Lexapro, which she did not like it because it made her feel irritable and anxious and did not seem to help. She told Dr. Morito that she is depressed most of the time. She does not like to see people, and likes to stay at home alone.

Huisman reported a history of muscle spasms, which started along with the fibromyalgia pain in 2001. At the time of the consultation, she was having spasms over her left hand, elbow, and shoulder. She also was suffering from restless leg syndrome. She had been on Sinemet to treat the RLS, but it had caused nausea and vomiting, so she was put on quinine sulfate which helped "markedly." She also had sleep problems. Although she was not having problems getting to sleep, about five times per night she was

---

[3]Huisman's history of suffering from fibromyalgia is confirmed throughout the record. For example, the her diagnosis of fibromyalgia is referenced in a report from the Rheumatology Clinic at the University of Iowa prepared in March 2005 (R. 236-39), and in notes by Dr. Smith on January 4, 2006 (*see, e.g.*, R. 241, 320, 324).

awakened by pain and muscle spasms. She stated that she feels feverish about once or twice a month. Also about once or twice a month, she suffers from migraines that last from one to three days. She described them as "throbbing headache[s] associated with loss of vision in the right eye and nausea and vomiting." R. 236. She takes tramadol for the headaches, and also has tried Imitrex, but neither of these medications has helped. She also has a history of carpal tunnel syndrome with carpal tunnel release.

Her physical examination was normal, except for limited range of motion in her neck. She had pain in four of eighteen tender points. She reported that her pain was diminished because she had taken several pain pills shortly before the examination. The doctor's impression was that "the multitude of symptoms she has including non-restoritive [sic] sleep, fatigue, and chronic pain suggest fibromyalgia. Also, she has had several diseases such as endometriosis, migraine headaches, juvenile rheumatoid arthritis, and carpal tunnel syndrome, that all cause significant pain, and, therefore, that may have contributed to her developing fibromyalgia." R. 238. The doctor stated, "The importance of regular exercise and staying active was emphasized to the patient. She will try either walking and/or strength training. She also could try pool therapy and should call us or her physician to make a referral." *Id*.

Dr. Morito stopped the prescription for Lexapro, and put Huisman back on Zoloft for her depression. He kept her on quinine sulfate and cyclobenzaprine to treat her RLS. He also gave her a prescription for Fiorinal and Maxalt for her migraines, and doxepin as a sleep aid and to help with her fibromyalgia. He told her she could continue the tramadol for her pain, but he instructed her to use less of the oxycodone, as it could lead to drug dependency and would not be of much help in treating her fibromyalgia.

On August 1, 2005, she returned to Trimark and was given prescriptions for tramadol and Cymbalta  On October 27, 2005, she was prescribed hydrocodone and cyclobenzaprine. On January 4, 2006, she saw Dr. Dustin Smith at Trimark, and he

confirmed that she has a long history of fibromyalgia: "I've cared for the [patient] at the Free Clinic in Clarion. Her pain cycles. She has been doing well for the past 3-4 days but before that had a long cycle of problematic pain." R. 241. His diagnosis was fibromyalgia, and he continued her current therapy. Huisman returned to Trimark for prescription refills in April, May, and July 2006.

On July 25, 2006, Huisman saw Dr. Smith for fibromyalgia and "worsening mood." She reported that her father had died recently, and she was spending more time "just being vegetative." Dr. Smith noted she was taking Vicodin (acetaminophen and hydrocodone), tramadol, Flexeril, and Cymbalta. He added a prescription for Lexapro, to help with her depression.

On August 2, 2006, William E. Morton, Psy.D. conducted a psychodiagnostic evaluation of Huisman for Disability Determination Services. The screening for depression was positive, "as [Huisman] reported subnormal sleep patterns, specifically, difficulty falling asleep, waking frequently throughout the night and waking up early without being able to return to sleep. Additional depressive symptoms include: appetite disturbance; irritability; tearfulness; loss of concentration; loss of motivation; little or no energy; fatigue; subjective feelings of sadness; anhedonia; social isolation; feelings of worthlessness; and feelings of hopelessness." R. 245. His diagnosis was "Major Depressive Disorder, Recurrent, Moderate." *Id*. He summarized her condition as follows:

> Ronna Huisman is a 46-year old female who appears in this office for a DDS evaluation. Her psychosocial history was unremarkable aside from: fibromyalgia, carpal tunnel syndrome, a history of depression and dissociation, fair educational history; and a fair family history.
>
> It appears that Ms. Huisman is able to adequately self-care and attend to the activities of daily living. She reports that she adequately manages her own finances and thus could handle cash benefits should she receive them. It appears that there are

moderate mental limitations in regard to remembering and understanding instructions, procedures, and locations; carrying out instructions; maintaining attention, concentration, and pace; interacting appropriately with supervisors, co-workers, and the public; or using good judgment and responding appropriately to changes in the work place.

*Id*.

On August 30, 2006, Dr. E. Reveiz conducted a disability examination of Huisman. The physical and neurological examinations were essentially normal, except a physical examination for fibromyalgia showed several points of pain and hypersensitivity at trigger and control points. The doctor diagnosed a possible history of fibromyalgia; a history of moderate osteoarthritis of the neck; a history of backache; a history of chronic depression, treated; and status post carpal tunnel surgery. He concluded as follows:

This is an interesting case. At the present time I don't believe she is depressed whatsoever. She seems to be compliant with the medications. She takes the Hydrocodone probably 3-4 every day and the Tramadol 50 mg 8 times a day which is a significant dose. I don't find any evidence of an acute inflammation in any joint. Mentally she seems to be stable. Her balance and motor function is quite satisfactory. If you distract her, she can reproduce exactly what you ask for. I think she is taking a tremendous amount of medicine. I think she should be re-evaluated in Iowa City and have them make the final determination. In my opinion, some work could be done.

R. 264. X-rays of Huisman's cervical spine were taken in October 2006, and were essentially normal.

On January 5, 2007, Huisman saw Dan L. Rogers, Ph.D. for a psychological assessment at the request of DDS. Dr. Rogers took a history and conducted a mental status examination. He also administered a Wechsler Memory Scale-III, and reviewed records for Dr. Morton's examination. He diagnosed Huisman as suffering from chronic

pain syndrome and fibromyalgia by history, and assigned her a GAF of 65. He concluded as follows:

> Ronna is experiencing mild deficiency in her memory function, consistent with her observed difficulty with concentration and attention. However, her working memory is good so it is likely that these problems are a result of her pain or other situational factors rather than a process of dementia. It appears to make worse by her attempts to control or distract herself from pain.

> There were no indications of Dissociative disorder, but rather distractibility and attempts to suppress pain. She also did not describe recent depression and her past depression appeared to be reaction to stress. She has no vegetative signs. It is difficult to tease out possible personality problems from the effects of chronic pain.

> She is able to understand and remember instructions, procedures, and locations, but only when her attention is adequate. However, her attention and concentration are not very good and combined with her pain they would make it hard for her to carry out instructions. She is able to interact appropriately with supervisors, coworkers, and the public, but she is likely to fatigue quickly when she interacts. Her judgment is good but she would have little of the psychological energy needed to adjust to changes in the work place.

> Ronna is able to manage cash benefits.

R. 286.

On February 2, 2007, Dr. Smith renewed Huisman's prescription for Vicoden. Huisman saw Dr. Smith again on February 5, 2007, and he noted, "Overall she is doing fair." R. 320. He continued her medication, except he discontinued the Vicodin and substituted Percocet (acetaminophen and oxycodone). On April 18, 2007, she saw Dr. Smith again for a follow-up of her "chronic medical problems." Her pain was better overall on her current regimen. She had been more active, although this sometimes had caused her some discomfort. Walking was fairly comfortable for her. The Lexapro was

helpful.  He substituted Mirapex for quinine for her RLS.  In August and October 2007, she apparently contacted Trimark to obtain prescription refills.  She saw Dr. Smith on February 12, 2008, for a follow-up of her fibromyalgia.  She reported she was walking about two miles on most days.  She had stopped taking the Lexapro and Cymbalta on her own volition.  Dr. Smith noted, "Overall she is doing fair.  She has found a way to schedule her medicines that works best for her."  R. 323.  He noted she was taking one Percocet in the morning and up to four Tramadol a day.  Dr. Smith strongly advised her "to be cautious about how her mood fluctuates and let [the people at Trimark] know if [they] need to intervene."  *Id*.  On November 11, 2008, she saw Dr. Smith for an injured finger.  He noted that she was suffering from fibromyalgia, and was taking cyclobenzaprine HCL, hydrocodone-acetaminophen, and oxycodone-acetaminophen.  On December 10, 2008, Huisman saw Dr. Smith for a "flare up of fibromyalgia," and for vomiting and diarrhea.  She also complained of "itchy eyes."

A vocational expert ("VE") testified at the ALJ hearing.  The ALJ asked the VE the following question:

> Could you please assume that we have a hypothetical individual and this individual has the same vocational profile as the Claimant?  This individual is limited – I have two specific main hypotheticals for you.  The first hypothetical, the individual is exertionally limited to the performance of no more than light work activity.  This individual can lift and carry occasionally up to 20 pounds, more frequently 10 pounds, stand and walk six hours in an eight-hour day, sit six to eight hours in an eight-hour day.  However, this individual would need to be able to change postural position every 30 minutes from standing or sitting.  This individual could only occasionally climb, bend, balance, stoop, kneel, crouch, crawl.  This individual could not continuously handle and finger.  This individual could frequently handle and finger but not continuously throughout an eight-hour workday.  This individual could only occasionally be exposed to extreme cold.  This individual's exposure to vibration should be limited to

> only occasional exposure. This individual should not be
> exposed to hazardous working conditions such as working
> around heights or moving machinery. This individual could
> not climb ropes, ladders, scaffolds and this individual would
> be limited to tasks that could be learned in 30 days or less
> involving no more than simple work-related decisions with few
> workplace changes. Now, could this hypothetical individual
> who has the same vocational profile as the Claimant perform
> their past work?

R. 48. The VE responded that the hypothetical individual would be able to work as a clerk
as that job is performed in the national economy.

The ALJ then asked the VE a second hypothetical question:

> Now, if this individual needed two to three unscheduled breaks
> per day on top of the regular normal breaks and lunch periods
> and these breaks would be of unknown duration but some-
> where between 10 to 15 minutes apiece, how would that
> limitation affect this individual's ability to perform her past
> work?

*Id.* The VE responded that the hypothetical individual would not be able to perform her
past work, or any other jobs in the national economy.

The ALJ then asked the VE the following"

> Now, if this individual were exertionally limited to no more
> than sedentary work and by that functionally I mean lifting and
> carrying 10 pounds, no more than 10 pounds, lifting and
> carrying less than 10 pounds frequently. This individual
> would be limited in standing and walking probably around two
> hours, up to two hours in an eight-hour day, sitting six to eight
> hours. This individual would still need to be able to change
> postural positions approximately every 30 minutes. The other
> limitations also remain in effect. . . . They're the same as
> they were for the light work activity without the unscheduled
> breaks. Now, at the sedentary level of exertion, could this

> hypothetical individual perform any of the work that they
> performed in the past?

R. 49. The VE answered "No," and added that the hypothetical individual would not be able to perform any other jobs in the national economy.

Huisman's attorney asked the VE to add the following restrictions to the person described in the ALJ's first hypothetical question: "In addition to these restrictions, this person is frequently in pain and for one-third to two-thirds of the workday [and] will not be able to concentrate, will work at a slower pace than what's required of the job and not be able to carry out instructions due to her attempts to control or distract herself from pain." R. 40. The VE responded that this person would not be able to return to her past work, or work at any other job.

The ALJ found that Huisman has not engaged in substantial gainful activity during the period from her alleged onset date of November 30, 2005, through December 31, 2006, her date last insured. She found that Huisman has the following severe impairments: fibromyalgia, chronic pain syndrome, depression, a history of migraine headaches, dissociative disorder, substance abuse in sustained remission, and status post right carpal tunnel release. She found that these impairments, singly or in combination, did not rise to the Listing level of severity, but when considered in combination, they reasonably could be expected to impose work-related limitations. She also found that despite these impairments, "the claimant has no restrictions of daily activities, mild restriction of social functioning; moderate difficulties maintaining concentration, persistence and pace; and no periods of decompensation." R. 13. The ALJ made the following residual functional capacity assessment:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, December 31, 2006, the claimant had the residual functional capacity to perform no more than light work activity as defined in 20 CFR 404.1567(b) such that she could occasionally lift

and carry 20 pounds and more frequently 10 pounds; stand and walk 6 hours in an 8-hour workday as well as sit for 6-8 hours in an 8-hour workday with postural position changes every 30 minutes from standing or sitting. She could only occasionally climb, bend, balance, stoop, kneel, crouch and crawl. She could not continuously handle and finger; however, she could frequently handle and finger. Environmentally, she could only occasional be exposed to extreme cold as well as only occasional exposure to vibration. She could not be exposed to hazardous working conditions such as heights or moving machinery. She would not be qualified to climb ropes, ladders or scaffolds. She would be limited to tasks learned in 30 days or less which involve no more than simple work-related decisions with few workplace changes.

R. 14., ¶ 5.

Based on these findings, the ALJ ruled that through Huisman's date last insured of December 31, 2006, she was capable of performing her past relevant work as a clerk. The ALJ reached this conclusion based on her finding that this work "did not require the performance of work-related activities precluded by [Huisman's] residual functional capacity." R. 18.

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined

in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, *supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than

a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon, supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433

F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)) *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting

*Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900

F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).  As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)     the claimant's daily activities;
> 2)     the duration, frequency and intensity of the pain;
> 3)     precipitating and aggravating factors;
> 4)     dosage, effectiveness and side effects of medication;
> 5)     functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984).  *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002).  The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence."  *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

Huisman contends the ALJ's RFC assessment (*see* R. 14, ¶ 5) was based solely on reports by two non-examining sources, one by Dr. James D. Wilson dated October 12, 2006, and the other by Dr. John May dated February 27, 2007.  Huisman notes the similarities between the ALJ's RFC assessment and the RFC assessments in these reports, and points out that there is no other evidence in the record upon which the ALJ could have based her assessment.  Huisman contends neither of these reports was based on the full record, and she argues that therefore, they cannot be relied upon to deny benefits.  *See* Doc. No. 8, at 7-10 (citing, *inter alia*, *Frankl v. Shalala*, 47 F.3d 935, 937-38 (8th Cir. 1995) (an ALJ cannot make an RFC assessment based on outdated medical records)).

The Commissioner responds by pointing out that the claimant has the burden of proving her RFC at step four of the sequential evaluation process.  Doc. No. 9, at 18 (citing *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)).  The Commissioner

acknowledges that even though the claimant has the burden at step four, it is the ALJ's duty to assess a claimant's RFC based on all relevant, credible evidence in the record, including the medical records, observations of treating physicians and others, and the individual's own description of her limitations. *See Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005). The Commissioner argues the ALJ considered all such evidence, and substantial evidence supports the ALJ's RFC assessment.

The ALJ included in her RFC assessment detailed findings relating to Huisman's impairments. For example, she found that Huisman "could occasionally lift and carry 20 pounds and more frequently 10 pounds; stand and walk 6 hours in an 8-hour workday as well as sit for 6-8 hours in an 8-hour workday with postural position changes every 30 minutes from standing or sitting." In the record, these restrictions can be found only in the reports of Dr. Wilson and Dr. May, neither of whom saw or evaluated Huisman. It is not clear how the doctors arrived at these restrictions. No basis for these specific restrictions can be found in the record.

Dr. Wilson stated in his report that Huisman had been seen only twice for fibromyalgia, in March 2005 and January 2006. This is a serious misrepresentation of the record. Dr. Smith specifically stated in his note from January 4, 2006, that Huisman had a "long history of fibromyalgia."[4] R. 241. The record also demonstrates that Huisman was seen for fibromyalgia numerous other times, both before and after the dates of these reports. Although many visits were for prescription refills, and some of the records do not specifically mention fibromyalgia, it is disingenuous to state she had been seen for fibromyalgia only twice. These types of consultative reports based on a purely paper review of the record are exactly the types of reports the Eighth Circuit Court of Appeals has referred to in the past as "medical sophistry at its best." *Nelson v. Heckler*, 712 F.2d 346, 348 (8th Cir. 1983) (citations omitted).

---

[4]Huisman's medical records from before 2005 are not part of the record in this case.

In any event, the reports were outdated long before the ALJ's decision. The records after January 2006 repeatedly refer to fibromyalgia. *See*, *e.g.*, R. 320 (in the notes of all of her visits to Trimark from July 25, 2006, to April 18, 2007, fibromyalgia is listed as the assessment). The notes of Huisman's visits to Trimark on February 12, 2008, and December 10, 2008, also specifically referred to her fibromyalgia. R. 323, 319. Although some of these records are after the period between the alleged date of disability, November 30, 2005, and the date last insured, December 31, 2006, they contradict the conclusions of the non-examining doctors about the seriousness of Huisman's impairments.

In addition, the ALJ's RFC assessment failed to consider the consequences of chronic pain from fibromyalgia, which the courts have described as "a common, but elusive and mysterious, disease, much like chronic fatigue syndrome. . . . Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). The Eighth Circuit has held, "in the context of a fibromyalgia case, that [even] the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity." *Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir. 2003) (citing *Kelley v. Callahan*, 133 F.3d 583, 535-89 (8th Cir. 1998)).

Further, although the ALJ recited the *Polaski* factors, *see* R. 17, she failed to apply them to Huisman. She failed to discuss the potential side effects from Huisman's medications, one of which could be the concentration difficulties Huisman described, or to consider the fact that narcotic pain medications have been prescribed for Huisman on an ongoing basis, adding credibility to Huisman's testimony that she has experienced significant pain for a long period of time. The ALJ further failed to identify the specific inconsistencies between the record evidence and Huisman's subjective complaints of disabling pain and concentration problems.

Because a full and complete credibility analysis is lacking, and the ALJ's RFC assessment is not supported by the record, the court finds it would be appropriate to remand the case for further proceedings, including any necessary development of the record regarding Huisman's work-related mental and physical limitations. Among other things, it appears likely that additional vocational expert testimony will be required to consider a hypothetical question that mirrors Huisman's limitations. *See Hutton v. Apfel*, 175 F.3d 651, 656 (9th Cir. 1999) (A "proper hypothetical question presents to the vocational expert a set of limitations that mirror those of the claimant."). Upon remand, it also would be appropriate to consider whether Huisman's prior application should be reconsidered on the merits.

Accordingly, the Commissioner's decision is hereby **reversed** and this case is **remanded** for further proceedings consistent with the above opinion.

**IT IS SO ORDERED.**

**DATED** this 21st day of April, 2010.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT